JOS. K., INC., PETITIONER *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3961–65. Filed January 13, 1969.

*William P. Shannahan*, for the petitioner.
*James A. Thomas*, for the respondent.

HOYT, *Judge:* Respondent determined the following deficiencies in petitioner's income taxes for the taxable years ended April 30, 1960, 1961, and 1962:

| Fiscal year | Deficiency |
| --- | --- |
| 1960 | $6, 805. 38 |
| 1961 | 14, 317. 24 |
| 1962 | 10, 471. 39 |
|  | 31, 594. 01 |

The only questions presented for our decision are whether respondent was correct in imposing the personal holding company tax of section 541, I.R.C. 1954, and if so, if petitioner is entitled to a divi-

dents-paid deduction to be carried back and applied to prior years before liquidation under section 562.[1]

OPINION

All of the facts have been stipulated and are adopted as our findings and incorporated herein by this reference.

The petitioner is a dissolved California corporation with its former principal office at 1533 Highland Avenue, National City, Calif. During the years here involved, the petitioner's books were kept and its income reported and returned on an April 30 fiscal year basis. The cash method of accounting was employed, and Federal corporate income tax returns were filed with the district director of internal revenue at Los Angeles, Calif., for the years ended April 30, 1960, 1961, 1962, and 1963.

Joseph K. Stanley for the period 1940–58 was associated with the South Bay Savings & Loan Association at Chula Vista, Calif., in the capacity of manager and controlling stockholder. In this capacity, he was primarily engaged in the real estate loan business. In 1958 Joseph sold his stock interest in the South Bay Savings & Loan Association and severed his relationship with that organization. However, because of his long experience, he intended to remain active in the business of making or acquiring real estate loans. Prior to his retirement from the Savings & Loan Association, he had set up two corporations whose functions were complementary and which were intended to aid Joseph in his prosecution of the loan and related businesses.

South Bay E & R Corp. was incorporated under the laws of the State of California on April 9, 1956. The main business of this corporation was to act as trustee under deeds of trust in connection with real estate transactions where the Savings & Loan Association had loaned money secured by trust deeds (of which it was the beneficiary) on various parcels of real estate. Joseph K. Stanley has owned 90 percent of the issued and outstanding stock of South Bay E & R Corp. since its inception, and upon the termination of his association with the Savings & Loan Association in 1958 it was agreed that South Bay E & R Corp. would continue to operate as trustee for the Savings & Loan Association for a period of 5 years. South Bay E & R Corp. also engaged to an undisclosed extent in the business of making real estate loans.

A second complementary corporation, South Bay Loan Service, was incorporated on May 27, 1957, under the laws of the State of

---

[1] All statutory references herein are to the Internal Revenue Code of 1954, unless otherwise noted.

California. Since its incorporation, Joseph has owned all of its stock. The primary function of South Bay Loan Service is to operate as an escrow company; however, it too also engaged in the making of real estate loans to an undisclosed extent. The funds used in the real estate loan business of South Bay Loan Service were obtained from Joseph K. Stanley and from his wife, Ernestine Stanley.

After 1958, when he severed his relationship with the Savings & Loan Association, Joseph founded two further complementary corporations, J.K.S. Enterprises and petitioner, Jos. K., Inc. J.K.S. Enterprises was incorporated on July 14, 1959, under the laws of the State of California, and since its inception, over 99 percent of its stock has been owned by Joseph K. Stanley. The primary business of this corporation was to act as a collection agency for holders of trust deeds; it received trust deeds, collected monthly payments from the debtors thereunder and after deducting a small collection charge, remitted the balance to the holder of the trust deed. In connection with this collection business, J.K.S. Enterprises also initiated foreclosure proceedings on behalf of the holders of trust deeds in appropriate cases.

The petitioner, Jos. K., Inc., was incorporated on April 23, 1959, some 3 months earlier than J.K.S. Enterprises (the collection agency) and under the following circumstances: In early 1959, South Bay Loan Service (the escrow company) had been audited by the State of California, Division of Corporations, in connection with that agency's control over escrow companies doing business in the State of California. After the conclusion of the audit, South Bay Loan Service received a letter from the Division of Corporations dated April 14, 1959, the effect of which was to state the division's conclusion that South Bay Loan Service's current liabilities exceeded its current assets by the amount of $20,388.13, resulting in a deficit of working capital. Section 1740 of title 10 of the California Administrative Code provides that escrow agents must be financially solvent, and the letter closed with a request that South Bay Loan Service advise the division of the steps which would be taken to comply with the solvency provisions of the California statute. Among South Bay Loan Service's debts was $286,700 owing to Joseph, the liability being evidenced by a series of demand promissory notes bearing interest at the rate of 6 percent per annum. The notes were identical in all respects except for the dates and amounts.

It was at this juncture, on April 23, 1959, as previously indicated, that petitioner was formally incorporated under the laws of the State of California, with Joseph K. and Ernestine Stanley owning 148 of the 150 original shares of issued and outstanding stock. At Joseph's direction, South Bay Loan Service discharged its indebtedness to him under the following procedure. Assets of South Bay were transferred to petitioner having a face value on petitioner's books of $286,700.

Petitioner then assumed South Bay Loan Service's indebtedness to Joseph K. Stanley in the amount of $286,700. These transactions occurred on May 1, 1959, 8 days after petitioner's incorporation and 17 days after South Bay Loan Service received the warning letter from the Division of Corporations. They were recorded on petitioner's books as follows:

| | Debit | Credit |
|---|---|---|
| Account receivable—South Bay Loan Service | $86, 114. 36 | |
| Real estate | 1, 759. 32 | |
| Notes receivable | 194, 352. 50 | |
| Accrued interest receivable | 4, 473. 82 | |
| Notes payable | | $286, 700. 00 |

To record acquisition of real estate and notes receivable (plus accrued interest) and assumption of notes payable (without accrued interest) from South Bay Loan Service

The record does not disclose if South Bay Loan Service was restored to solvency with the completion of the transaction just described, to the satisfaction of the California Division of Corporations, but petitioner's corporate existence was launched with an assumption of indebtedness amounting to $286,700 and a corresponding receipt of assets from South Bay Loan Service in the same amount.[2] Petitioner was authorized to issue 2,500 shares of common stock at a par value of $10 per share. During the entire period of its existence, only 150 shares were ever issued and outstanding, and, as mentioned, 148 of these were owned by Joseph and Ernestine; Joseph served as petitioner's president throughout the period. Petitioner commenced business with an initial capitalization of $1,500.

During its entire existence, petitioner was engaged principally in the business of making real estate loans, and during this span of time petitioner's business operations were conducted out of the same office in which the operations of Joseph's three other complementary corporations were being carried on. That is, the petitioner, a loan company, was being operated at the same office with South Bay E & R Corp. (trustee for trust deeds), South Bay Loan Service (escrow company), and J.K.S. Enterprises (collection agency). The building in which all four corporations were housed displayed a large neon sign with the words "South Bay Loan Service." The names of all four corporations were on the front door. Four employees assisted Joseph Stanley in the operation of these four corporations. They were a bookkeeper, two escrow officers, and one clerical employee. The salaries of these employees were allocated to the four corporations in accordance with services rendered to each.

All the loans made by petitioner during its 4-year existence were made to business friends and acquaintances of Joseph K. Stanley. It

---

[2] Technically, Jos. K., Inc.'s corporate existence began 8 days earlier on Apr. 23, 1959.

was not necessary for petitioner to advertise or solicit loans. Rather, as a result of Joseph's long connection with the real estate loan industry, business friends and acquaintances would come to him for loans, and during petitioner's 4-year corporate life, many loans were made, the rate of interest varying from a low of 6.6 percent to a high of 7 percent. These loans will be discussed in greater detail below. However, it is accurate to state generally that a substantial percentage of the funds which petitioner used in its lending business was provided by the Stanleys or one of the complementary corporations in the form of "advances" or loans.

The initial capitalization of $1,500 and the assets which were transferred by South Bay Loan Service to petitioner simultaneously with the assumption of its liability on notes to the Stanleys, were insufficient to fund an active loan business on the scale of petitioner's operations during its 4-year life and its first 2 years particularly. The record is devoid of any evidence that persons other than the Stanleys or two of their other three complementary corporations ever made any capital contributions, advances to, or deposits with the petitioner. The funds to operate petitioner's business were entirely furnished by the Stanleys, or by one of the other Stanley corporations housed in the same office with petitioner. No portion of petitioner's business operation in any year before us consisted of receiving funds from other investors or depositors.

During the first fiscal year, ended April 30, 1960, petitioner made 115 loans in the total amount of $702,631.41, all secured by first or second deeds of trusts.[3] During the same year, the Stanleys and South Bay Loan Service lent the amounts listed below to petitioner on the following dates and at the stated rate of interest. No funds received by petitioner during this fiscal period were "subject to check"; checks or orders to pay could not be written against these funds.

| | Amount | Interest | Date |
|---|---|---|---|
| | | *Percent* | |
| Jos. K. and Ernestine Stanley | $50,000 | 6 | 9/22/59 |
| Jos. K. and Ernestine Stanley | 80,000 | 6 | 10/ 9/59 |
| Jos. K. and Ernestine Stanley | 10,000 | 6 | 2/ 3/60 |
| Jos. K. and Ernestine Stanley | 10,000 | 6 | 2/ 3/60 |
| Jos. K. and Ernestine Stanley | 10,000 | 6 | 2/23/60 |
| South Bay Loan Service | 15,000 | 6 | 3/ 7/60 |
| South Bay Loan Service | 5,000 | 6 | 3/11/60 |
| Jos. K. and Ernestine Stanley | 70,000 | 6 | 4/26/60 |

All of the advances or loans listed above were evidenced by unsecured demand promissory notes bearing interest at the rate of 6 percent

---

[3] Of these 115 loans, more than half were made to two separate builders, "Brown and Parker."

per annum and payable at maturity. These notes were on printed forms entitled "Straight Promissory Note" with the blanks filled in to reflect the details of a particular loan.

Over 99 percent of petitioner's income for the fiscal year ended April 30, 1960, was from interest or "loan fees" derived from real estate loans. More specifically, petitioner in this period reported the following gross income:

| | |
|---|---:|
| Fees for drawing paper | $78.00 |
| Loan fees | 7,949.62 |
| Demand fees | 55.00 |
| Interest | 22,140.09 |
| Total income | 30,222.71 |

At the end of this first fiscal period, April 30, 1960, petitioner's balance sheet reflected notes receivable (less reserve for bad debts) of $555,963.01 and notes payable of $536,700. This latter figure represents the sums advanced to petitioner by the Stanleys and South Bay Loan Service, as well as the assumed South Bay Loan Service's indebtedness to the Stanleys at the time of petitioner's incorporation. The notes receivable figure, representing 99 percent of petitioner's assets, consists of the balance due on loans made in the first year of operation, as well as the balance due on South Bay Loan Service's notes receivable which were transferred to petitioner as assets at the time of its incorporation. The notes payable figure represents 94 percent of petitioner's total liability and net worth.

No loan to Joseph or Ernestine Stanley exceeded $5,000 in principal amount during this first fiscal year. Earnings and profits were accumulated on operations for the year in the amount of $8,241.62, and during the year $40,000 of the amount owing to the Stanleys was repaid.

During the next fiscal year, which ended on April 30, 1961, petitioner made 39 loans secured by first or second deeds of trust and these loans totaled $87,363.33 in amount.[4] During this second fiscal period, petitioner reported the following gross income:

| | |
|---|---:|
| Fees for drawing paper | $14.00 |
| Loan fees | 3,877.50 |
| Demand fees | 15.00 |
| Interest | 46,783.74 |
| Total income | 50,690.24 |

Again to provide needed funds for petitioner's loan operations, the Stanleys and one of the complementary corporations advanced moneys to petitioner during this year. The following amounts were advanced,

---

[4] Of these loans, more than 30 were made to the builder named Brown who received many of the loans made during the preceding fiscal year.

and the advances were likewise evidenced by printed-form unsecured 6-percent demand promissory notes with interest payable at maturity:

|  | Amount | Interest | Date |
|---|---|---|---|
|  |  | *Percent* |  |
| Jos. K. and Ernestine Stanley | $5,000 | 6 | 5/ 3/60 |
| Jos. K. and Ernestine Stanley | 5,000 | 6 | 5/24/60 |
| Jos. K. and Ernestine Stanley | 10,000 | 6 | 6/28/60 |
| J.K.S. Enterprises | 5,000 | 6 | 6/28/60 |

None of the funds received by petitioner during this second fiscal period were "subject to check."

The balance sheet at the end of this second fiscal period, April 30, 1961, reflected notes receivable (less reserve for bad debts) in the amount of $468,298.79. Notes payable came to $516,700. The sources of both the receivables and payables are the same as for the year ended April 30, 1960, except that new loans to borrowers and new advances from the Stanleys and J.K.S. Enterprises are reflected. The notes receivable account of $468,298.79 represented 81 percent of petitioner's total assets. The remainder of petitioner's assets was in cash, excepting a real estate parcel whose book value was only $1,759.32, this asset being one of South Bay's assets transferred on May 1, 1959. The notes payable figure represents 90 percent of petitioner's total liabilities and net worth.

In the second fiscal year, no loans to Joseph or Ernestine Stanley exceeded $5,000 in principal amount. During the year $17,079.10 was added to accumulated earnings and profits, and $25,000 of the funds advanced was repaid to the Stanleys and the complementary corporations.

For petitioner's third fiscal year, May 1, 1961 through April 30, 1962, five secured loans were made which totaled $95,322.92 in amount. During this fiscal period petitioner reported the following gross income:

| | |
|---|---|
| Demand fees | $72.50 |
| Interest received | 39,909.86 |
| Realized discounts | 6,006.96 |
| Loan fees | 100.00 |
| Total income | 46,089.32 |

As in all other fiscal periods before us, the table above demonstrates that over 99 percent of petitioner's income was from interest, loan fees, or realized discounts. In this period, no further funds were advanced by the Stanleys or any of the corporations controlled by them, and at the close of this fiscal period, the balance sheet reflected notes receivable (less reserve for bad debts) of $406,667.87 and notes payable of $496,700. The "notes receivable" figure accounts for 71 percent of

petitioner's assets. More than 99 percent of the remainder of petitioner's assets was in cash. The notes payable figure represents 86 percent of petitioner's total liabilities and net worth.

As always, loans to the Stanleys were less than $5,000 in principal amount. The record is devoid of any evidence that there were any advances or loans to, or deposits with petitioner from any source during this fiscal period, all notes payable at the end of the year being balances remaining unpaid on loans or advances made in earlier years. The earnings and profits accumulated for the year came to $12,554.57, and there were no repayments to the Stanleys or the Stanley-controlled corporations which had advanced funds in prior years.

For the fourth and final fiscal period of petitioner's existence, the record fails to disclose whether any loans were made. In this period, however, the following gross income was reported:

| | |
|---|---:|
| Interest income | $29,382.49 |
| Demand fees | 50.00 |
| Discount realized | 2,090.23 |
| Bad debt reserve | 12,369.09 |
| Total income | 43,891.81 |

The earnings and profits which were accumulated in this final fiscal period came to $7,335.42 and $130,000 of the funds he had advanced earlier was repaid to Joseph Stanley.

On April 30, 1963, at the close of its final fiscal period the petitioner was liquidated pursuant to the Corporation Code of the State of California, and all of its assets were distributed to its shareholders on that date. At this time, the total earnings and profits of the petitioner accumulated over its 4-year life and after February 28, 1913, came to $45,210.71. The distribution of assets to the shareholders on April 30, 1963, included this amount of $45,210.71 properly chargeable to earnings and profits. To reflect the final distribution in liquidation, the following journal entries were made on petitioner's books on April 30, 1963:

| Description | Charges | Credits |
|---|---:|---:|
| Notes payable | $349,671.26 | |
| Accrued Federal income tax | 3,143.75 | |
| Unrealized discounts | 18,316.62 | |
| Stock | 1,500.00 | |
| Surplus | 45,210.71 | |
| Bank—U.S. National | | $100.68 |
| Oceanside S/L Assn | | 10,000.00 |
| Notes receivable | | 405,982.34 |
| Lot 376, Lincoln Acres | | 1,759.32 |

To close all accounts—Corporation liquidated

The petitioner met the gross income requirement of section 543(a) (1) and the stock ownership requirement of section 542(a)(2) in each of the fiscal years before us.

The petitioner's shareholders, on their individual returns for 1963, reported the distribution of the assets in complete liquidation under section 331 as capital gain.

In his notice of deficiency to petitioner corporation, respondent determined that Jos. K., Inc., was a personal holding company as defined in section 542(a) of the 1954 Code and therefore liable for the personal holding company surtax for each of its fiscal years 1960, 1961, and 1962. We agree that petitioner was a personal holding company within the meaning of section 542 during each of such years and had undistributed personal holding company income within the meaning of section 545 of $8,241.62, $17,079.10, and $12,554.57, those amounts being accumulated earnings and profits for the respective years, 1960, 1961, and 1962.

The parties have agreed to certain adjustments in petitioner's income for the years before us as to interest expense, bad debt, and "discounts earned" items. The only question for our decision is whether respondent was correct in imposing the personal holding company tax of section 541, which tax was computed on the basis of petitioner's reported taxable income, plus or minus the adjustments agreed to by the parties for each year in issue.

The definition of personal holding companies as presently found in section 542(a), did not exist in precisely the same form during the years in issue. During those years, the "gross income requirement" was 80 percent instead of the present 60 percent.[5] In each of the 4 fiscal years of its existence, petitioner met both the "gross income" and "stock ownership" definitional requirements of sections 543(a)(1) and 542 (a)(2) as they then existed.

The parties agree and the petitioner concedes that the "loan fees" received by petitioner in each fiscal period constituted interest income within the meaning of section 543 (defining personal holding company income). There is therefore no question but that the petitioner fell within the statutory definition of a personal holding company, unless it can show that it is entitled to treatment under the exceptions provided for by former section 542(c)(8). Respondent has not asserted the personal holding company tax for petitioner's fourth and final fiscal period (the year ended Apr. 30, 1963), because of the final distribution in liquidation at the close of that period; a dividends-paid deduction under sections 561(a)(1) and 562(b), I.R.C. 1954, as they then provided for that year, has been allowed for fiscal 1963.

---

[5] See the amendments made by sec. 225, Revenue Act of 1964.

Petitioner advances two arguments which, if successful, would relieve it from liability for the earlier years even though the definitional requirements of section 542(a) are met.

(1) Petitioner argues primarily that it falls within the exception for "a loan or investment corporation," which during the years in issue was provided for in former section 542(c) (8).

(2) In the alternative, petitioner argues that it is entitled to a dividends-paid deduction under section 562(b), by a retroactive application and carryback of the liquidating dividend to former years.

Section 542(c) provided in pertinent part as follows during the year in issue.[6]

(c) EXCEPTIONS.—The term "personal holding company" as defined in subsection (a) does not include—

\*          \*          \*          \*          \*          \*          \*

(8) a loan or investment corporation, *a substantial part of the business of which consists of receiving funds not subject to check and evidenced by installment or fully paid certificates of indebtedness or investment*, and making loans and discounts, and the loans to a person who is a shareholder in such corporation during such taxable year by or for whom 10 percent or more in value of its outstanding stock is owned directly or indirectly (including, in the case of an individual, stock owned by members of his family as defined in section 544(a)(2)) outstanding at any time during such year do not exceed $5,000 in principal amount. [Emphasis added.]

It is clear that petitioner was, basically and generically, a corporation actively engaged in the business of making or acquiring real estate loans for at least the first 2 years of its 4-year life. However, this fact alone will not qualify it for the exception treatment which is sought. Under the plain language of the statutory paragraph just quoted, several technical and more exacting requirements than the mere operation of a nonregulated loan business are called for.

Section 542(c)(8), itself now recast, has not to our knowledge ever been directly in issue or interpreted in a judicial proceeding although its predecessor under the 1939 Code, sec. 501(b)(7), has been distinguished and held to be mutually exclusive with respect to section 501(b)(6)(B), I.R.C. 1939. See *Liberty Finance Service, Inc.*, 34 T.C. 682 (1960). Despite the lack of prior judicial interpretation, a close analysis of the statutory language reveals that five separate requirements must be met before a corporation is entitled to exception treatment under former section 542(c)(8), I.R.C. 1954. These requirements are as follows:

(1) The taxpayer must be a loan or investment corporation;

(2) a substantial part of whose business consists of receiving funds not subject to check,

---

[6] Sec. 542(c)(8) was eliminated and recast by sec. 225, Revenue Act of 1964. See present secs. 542(c)(6) and 542(d), I.R.C. 1954.

(3) which are evidenced by installment or fully paid certificates of indebtedness or investment;

(4) and a substantial part of whose business consists of making loans and discounts.

(5) Loans to a shareholder owning 10 percent or more in value of its outstanding stock (under pertinent attribution rules) must not exceed $5,000 in principal amount at any time during such year.

Petitioner submits that each of these requirements was met during each of the 3 years in issue. We disagree. The petitioner during at least some years met requirements (1), (4), and (5). However, we do not believe that requirements (2) and (3), which are related, were met by petitioner, i.e., *receiving funds* not subject to check which are evidenced by *installment or fully paid certificates of indebtedness or investment,* as a substantial part of its business.

In short, even if the loans or "advances" by the Stanleys to petitioner corporation are considered to constitute a substantial part of its business *and* "receiving funds not subject to check," which proposition we reject as being clearly not within the statutory contemplation, these advances were not evidenced by "certificates of indebtedness" but by ordinary-form demand promissory notes. Petitioner insists that its loans from the Stanleys constituted a substantial part of its business and that, in effect, the statutory terminology "certificates of indebtedness" means nothing more than instruments of indebtedness generally. It is concluded and urged by petitioner that we likewise conclude that the promissory notes issued by petitioner to the Stanleys are within this broad category.

In the articles of incorporation of Jos. K., Inc., the principal purpose for which the corporation was formed was stated to be the "buying, selling and otherwise dealing" in real estate loans. Incidental to this purpose, the usual other purposes and powers were provided for, including power to borrow money, enter into contracts, etc. However, nowhere do the articles indicate that petitioner was incorporated to operate a business to receive funds or deposits from the general public. We must conclude that it would subvert the congressional purpose and intent to hold that because the corporation and its shareholders determined to finance the corporate operation by borrowing funds from the shareholders, a substantial part of the business of the corporation was "receiving funds not subject to check."

If the shareholders had made additional contributions to petitioner's capital either by stock purchases or otherwise and petitioner had thus obtained the funds needed to finance its operations, it would have received funds not subject to check but it would have been no more in the business of "receiving funds not subject to check" within the statutory intendment than we believe this petitioner was in the years before

us. The method adopted internally by the officers and shareholders to finance petitioner's business operation did not convert the business itself into one of "receiving funds" as that term is used in the statute.

The entire concept of "a loan or investment corporation" excepted by section 542(c)(8) of the statute, is of a corporation in the business of receiving funds evidenced by installment or fully paid certificates of indebtedness to a substantial extent and making loans, etc. As we view the loans to the corporation in question, we conclude that while they resulted in the receipt of funds they in no sense constituted a part, let alone a substantial part, of the corporation's business; they were merely a financing arrangement worked out with petitioner's 99-percent stockholders to supply capital to their alter ego, Jos. K., Inc.

However, even if petitioner were to prevail with respect to the argument that its business qualifies for the exception, because a substantial part of its business consisted of receiving funds not subject to check, we would conclude notwithstanding that it does not meet the further requirement that such funds be evidenced by "installment or fully paid certificates of indebtedness or investment." Here the loans or advances from Stanley to petitioner were evidenced by printed-form demand promissory notes of the most elemental kind, and nothing more.

In support of its contention that the phrase "certificates of indebtedness" includes demand promissory notes, petitioner relies upon a broad interpretation of the legislative history of section 542(c)(8), to be discussed, *infra*, as well as the Webster's Dictionary definition of certificate of indebtedness to mean "a short-term negotiable promissory note issued by a government or a corporation as evidence of a floating indebtedness." Webster's Third New International Dictionary (1961). We find this reliance misplaced. While ordinary words, we think, should often be given their ordinary meaning so that science and skill are not required on the part of the general public in understanding them, technical words must be given their technical meaning. See *United States* v. *Isham*, 17 Wall. 496, 503–504 (1873).

In this instance, we conclude that "certificates of indebtedness" must be given a commonly accepted technical and legal meaning, and not the more general dictionary meaning found in Webster's Third New International, a meaning we consider too broad. The terminology "certificate of indebtedness" connotes a more formal document in the nature of a security instrument. We must acknowledge that the term does not import as exact a definition as is desirable in taxing statutes, but in our view an unsecured demand promissory note lacks the necessary formality and, perhaps, the necessary security to qualify as a certificate of indebtedness. We believe the definition for certificate of indebtedness found in Black's Law Dictionary (4th ed. 1951),

represents a more commonly accepted *legal* definition, if we were reduced to resolving this dispute in a battle of lexicographers:

CERTIFICATE OF INDEBTEDNESS. An obligation sometimes issued by corporations having practically the same force and effect as a bond, though not usually secured on any specific property. Christie v. Duluth, 82 Minn. 202, 84 N.W. 754. It may, however, create a lien on all the property of the corporation issuing it, superior to the rights of general creditors. * * *

Fortunately, we are not reduced to relying solely upon our dictionary preference.

The legislative history of section 542(c)(8) is somewhat obscure, but it is available, and the Supreme Court in an unrelated stamp-tax case has distinguished promissory notes from certificates of indebtedness. See *United States* v. *Leslie Salt*, 350 U.S. 383 (1956), which indicate that certificates of indebtedness are akin to bonds and debentures, and have the general character of investment securities. This decision is not directly relevant to the instant case, but we believe it advances a general and commonly accepted definition of certificates of indebtedness.

As mentioned, however, petitioner does not base his claim solely on the ground that his is a definition found in Webster's Dictionary. He urges that the legislative history of section 542(c)(8) indicates that a broad range of lending companies was to be excepted, and that these diverse types of lending organizations cannot be expected to issue a formal corporate security for the funds which they receive for lending out at profitable rates of interest.

The exception for loan or investment companies was made part of the Code by section 182(b)(7), Revenue Act of 1942, which added section 501(b)(7), I.R.C. 1939. This addition provided almost verbatim the same specifications as did section 542(c)(8) of the 1954 Code during the years in issue.

When the original personal holding company surtax was added by the 1934 Revenue Act, banks, a substantial part of whose business was the receipt of deposits, had been excluded from coverage. Sec. 351 (b), Revenue Act of 1934. See also S. Rept. No. 558, 73d Cong., 2d Sess., p. 15 (1934). Two years later, in 1936, another exception was added for another group of active lenders, the "small loan companies." See sec. 351(b)(1), Revenue Act of 1936, and S. Rept. No. 2156, 74th Cong., 2d Sess., p. 24 (1936). In the Revenue Act of 1938, the exception for small loan companies was rephrased so that the special treatment was available only for "licensed personal finance companies." Sec. 402(b), Revenue Act of 1938.

These exceptions were carried forward into the 1939 Code in sec. 501(b), so that in 1942 when the exception presently in issue was added, the posture of the forces arguing for its addition was that

there was unfair or inequitable treatment for large lenders whose qualification under the exception for banks (as defined by sec. 104, I.R.C. 1939) was uncertain.

A substantial impetus for the new exception which became section 501(b)(7), I.R.C. 1939 (sec. 542(c)(8), I.R.C. 1954), was provided by two concerned business associations. These were the American Industrial Bankers Association and the Morris Plan Bankers Association. The presidents of both these associations testified before the House Committee on Ways and Means. The crux of their testimony was that a large number of lending organizations which filled and performed classical banking functions were not being accorded exemption treatment. See generally Hearings before the House Committee on Ways and Means on Revenue Provision of 1942, 77th Cong., 2d Sess., vol. 3, pp. 2688–2691. These functions were said to be: (1) Assembling capital and making it effective; (2) receiving deposits and making collections; and (3) lending and discounting. Hearings, *supra* at 2691.

The American Industrial Bankers Association proposed the following exemption, which is practically identical to section 501(b)(7), I.R.C. 1939, as ultimately enacted by the 1942 Revenue Act (sec. 542(c)(8), I.R.C. 1954). Under the proposal, the exemption would be extended to:

*an industrial loan and investment company incorporated and doing business under the laws of any State, a substantial part of the business of which consists of receiving funds not subject to check and evidenced by installment or fully paid certificates of indebtedness or investment, and making loans and discounts * * * and which company is subject by law to supervision and/or examination by State authority having supervision over such institutions, and which company has not, during the taxable year, made loans, directly or indirectly, to any of its controlling stockholders.* [Hearings, *supra* at 2691.]

In reporting out the amendment which became section 501(b)(7), I.R.C. 1939, the Senate Finance Committee described the provision generally and explained its decision to delete the requirement which was included in the American Industrial Bankers Association proposal and the original House version that qualifying lenders must be under State supervision.

They [the excepted companies] exist in most States under various designations such as industrial banks, industrial loan and investment companies, loan corporations, loan and investment companies, banking companies, industrial loan and thrift companies, Morris Plan companies, special plan banks, installment investment companies, and consumer discount companies. These loan companies *have many of the characteristics of banks except the right to accept deposits subject to check.*

The House bill in the case of licensed personal finance companies and loan or investment companies imposed a limitation that the companies must be "subject to the supervision of State authority having supervision over financial insti-

tutions." * * * In the case of loan or investment companies the laws of the various States are not as uniform as they are with respect to licensed personal finance companies. Many loan or investment companies are not under State supervision or subject to the supervision of State authority having supervision over financial institutions. In view of the fact that section 501(b)(7) contains other limitations which appear adequate, this section is changed to eliminate the provision of the House bill that loan or investment companies be "subject to the supervision of State authority having supervision over financial institutions." In the case of these companies the requirement that they be under State supervision or any other similar provision is not believed necessary.[7] [Emphasis added. S. Rept. No. 1631, 77th Cong., 2d Sess. 174–175 (1942).]

Petitioner's argument that the broad range of companies which the Finance Committee Report mentions for exception treatment indicates that no particular formality is required in the debt instruments issued by qualifying lending companies must be viewed in the light of this background. We think the legislative history of the loan company exception here involved indicates rather conclusively that petitioner's view of a qualifying lending operation is not in accord with congressional intent. For its part, petitioner did not even attempt to demonstrate by proof that any of the broad range of companies mentioned in the Senate Finance Committee Report, *supra*, issue demand promissory notes to those persons who supply them with funds through account investments or deposits. It is clear to us that Congress was acting in response to the complaints of lenders who were "near banks," but whose qualification as banks under section 104, I.R.C. 1939, was not in all cases assured, the uncertainty being in part attributable to the differing treatment accorded by the States to lending organizations not accepting deposits subject to check.

The hearings and committee reports considered together leave no doubt that the category of lenders intended to be excepted were those companies which receive funds from the general public (upon which check could not be drawn) and issued either investment paper or made entries in a formal passbook to evidence the debts to investor-depositors. The provision definitely contemplates an operation very similar in nature to that of a commercial or industrial bank, except that the funds supplied by depositors cannot be drawn upon by check. Nowhere is it even suggested that what would otherwise be regarded as a personal holding company should be exempt merely because it finances its operation by borrowing from its own shareholders.

Two cases were cited to the Ways and Means Committee in illustration of the sort of lending business for which statutory exception was sought. See *Staunton Industrial Loan Corporation* v. *Commissioner*, 120 F. 2d 930 (C.A. 4, 1941), reversing 42 B.T.A. 1030 (1940); *Morris*

[7] Apparently the House Committee on Ways and Means was concerned that mere "incorporated loan sharks," to use their terminology, might qualify for exception treatment. See H. Rept. No. 2333, 77th Cong., 2d Sess., p. 135 (1942).

*Plan Bank of New Haven* v. *Smith*, 125 F. 2d 440 (C.A. 2, 1941). In both of these reported cases, the Court of Appeals ultimately held the lending company in issue to be a qualifying bank under section 104, I.R.C. 1939. However, the lower courts, including this Court, had disagreed, and the trade associations mentioned above were obviously endeavoring to obtain statutory exception for these "near banks" which could not or did not accept checking accounts.

In both of the cases just cited, the lending organizations received funds (deposits) from the general public and issued in return formal certificates of indebtedness, formal certificates of investment, or a passbook issued to the depositor. Both cases recognize that an important reason a special category had been created earlier for banks was to enable those lending institutions to build up sufficient surpluses to protect *depositors*. See also the Ways and Means Committee Hearings on the 1942 Revenue Act, *supra* at 2691.

As we view it, Congress added section 501(b)(7) to the 1939 Code in response to the claims of a class of corporate lenders who, in the words of the Senate Finance Committee report, *supra*, had "many of the characteristics of banks." The similarity of the bill as passed to the legislation proposed by the American Industrial Bankers Association, *supra*, is striking. It is apparent to us, considering the legislative history as a whole, that qualifying companies must be in the business of receiving funds, analogous at least in some sense to banking deposits, from the public. Again, we think the category of lenders meant to be excepted is described quite adequately in the two cited cases, *Staunton Industrial Loans Corporation* and *Morris Plan Bank of New Haven*, *supra*.

The petitioner in the instant case did not receive funds from the general public in the nature of deposits not subject to check. To borrow the language of section 542(c)(8), no part of its business consisted of "receiving funds not subject to check and evidenced by installment or fully paid certificates of indebtedness." As our findings reflect, the only funds shown to have been received by petitioner on the record before us were "advances" by the 99-percent shareholders, Joseph K. and Ernestine Stanley (or by two corporations controlled by them), these advances being evidenced by unsecured promissory notes, and not by a formal certificate of indebtedness or investment, or even a passbook instrument.[8]

---

[8] The parties seem to have agreed that petitioner was thinly capitalized in their settlement of an issue not before us for decision. In the taxable year ended Apr. 30, 1961, petitioner apparently deducted some of the "interest" at 6 percent which it had paid Joseph K. Stanley on funds "advanced" to it. The amount deducted by this cash basis taxpayer as interest on the Stanley advances was only $4,166.70. The parties stipulated that for purposes of determining the deductibility of this purported interest payment they entered into a pre-deficiency notice agreement that interest on $336,700 would be treated as a dividend distribution. This latter figure represents more than 60 percent of the total notes payable at year end.

While we have stressed the form of the instruments evidencing the indebtedness, the requirement of a "certificate" is merely an incidental and related requirement to the fundamental notion that the qualifying "loan or investment corporation" receive funds analogous to deposits or other funds invested from "outside" investors or savers. If it were not anticipated that funds would be deposited and invested from the community at large, why would the formality of a "certificate" have been required? This word choice reinforces our belief that to qualify under former section 542(c)(8), a "loan or investment corporation" must receive funds or deposits from the public. We conclude that the petitioner herein did not quality for the exception afforded under section 542(c)(8) during any of the years in issue.

In reaching the conclusion just stated, we have, as urged by the parties, resorted to the legislative history of the section, including the committee hearings. We think that a court may seek out any reliable evidence of legislative purpose even when the statutory language appears to be clear. See *J. C. Penney Co.*, 37 T.C. 1013, 1021 (1962), affd. 312 F. 2d 65 (C.A. 2, 1962); *Max Carasso*, 34 T.C. 1139, 1142 (1960), affd. 292 F. 2d 367 (1961), certiorari denied 369 U.S. 874 (1962). *A fortiori*, when the statutory language is unclear, or even vague in its meaning, it is particularly appropriate to ferret out the congressional intent through all reliable evidence. See, e.g., *Church of the Holy Trinity* v. *United States*, 143 U.S. 457, 464 (1892); see generally 2 Sutherland, Statutory Construction, sec. 5009. Also in applying a carved-out exception such as the one here involved in section 542(c)(8), we also must, as respondent suggests, keep constantly in mind that the personal holding company surtax is designed to prevent the use of the "incorporated pocketbook" as a device used to avoid income taxes otherwise due from investors. The substance of the transactions here involved was nothing more or less than a slight variation of that familiar theme by which the Stanleys invested their funds in real estate loans held by petitioner corporation. Petitioner was in every sense their personal incorporated pocketbook.

Having concluded that petitioner was a personal holding company during the years in issue and not excepted by former section 542(c)(8), we now turn to petitioner's alternative argument that it is entitled to a dividends-paid deduction for each year in issue under section 562(b), I.R.C. 1954, as it existed in those years.[9]

On April 30, 1963, petitioner was liquidated and all of its assets were distributed to the shareholders. On the liquidation date, petitioner had accumulated earnings and profits totaling $45,210.71. Petitioner contends that under section 562(b) it is entitled to a liquidating divi-

___

[9] As with most of the other Code sections cited herein, technical changes were made by sec. 225, Revenue Act of 1964.

dend deduction in this amount, and that it is entitled to apply the deduction against its personal holding company income from the prior years and thereby eliminate all personal holding company income for the years in issue.

Respondent's position is that the liquidating dividend deduction to which petitioner is entitled may be applied only against the taxpayer's personal holding company income of the taxable year in which the distribution was made, i.e., the fiscal year ended April 30, 1963. Respondent has applied the liquidating dividend against petitioner's personal holding company income for this final fiscal year, and the final year is not therefore in issue.

A review of the applicable statutory provisions reveals that petitioner's contention, which would grant him something in the nature of a "carryback," is simply not authorized by the statutory scheme. All statutory references, as mentioned, are to the 1954 Code sections as they existed during the years in issue.

Section 541 imposed a personal holding company tax on undistributed personal holding company income as defined by section 545. Section 545(a) of the Code defined undistributed personal holding company income as follows:

* * * For purposes of this part, the term, "undistributed personal holding company income" means the taxable income of a personal holding company adjusted in the manner provided in subsections (b), minus the dividends paid deduction as defined in section 561.

Section 561 went on to define the deduction for dividends paid as follows:

(a) GENERAL RULE.—The deduction for dividends paid shall be the sum of—
(1) *The dividends paid during the taxable year,*
(2) the consent dividends for the taxable year (determined under section 565), and
(3) in the case of a personal holding company, the dividend carryover described in section 564.
(b) SPECIAL RULES APPLICABLE.—*In determining the deduction for dividends paid, the rules provided in section 562 (relating to rules applicable in determining dividends eligible for dividends paid deduction) and section 563 (relating to dividends paid after the close of the taxable year) shall be applicable.*
[Emphasis added.]

Finally, section 562,[10] on which petitioner relies, provided during the years before us, in pertinent part, as follows:

* * * Rules Applicable in *DETERMINING DIVIDENDS ELIGIBLE FOR DIVIDENDS PAID DEDUCTION.* [Emphasis added.]
(a) GENERAL RULE.—For purposes of this part, the term "dividend" shall, except as otherwise provided in this section, include only dividends described in section 316 (relating to definition of dividends for purposes of corporate distributions).

---

[10] This section was amended for years after Dec. 31, 1963, Pub. L. 88-272, sec. 225.

(b) DISTRIBUTIONS IN LIQUIDATION.—In the case of amounts distributed in liquidation, the part of such distribution which is properly chargeable to earnings and profits accumulated after February 28, 1913, shall be treated as a dividend for purposes of computing the dividends paid deduction. In the case of a complete liquidation occurring within within 24 months after the adoption of a plan of liquidation, any distribution within such period pursuant to such plan shall, to the extent of the earnings and profits (computed without regard to capital losses) of the corporation for the taxable year in which such distribution is made, be treated as a dividend for purposes of computing the dividends paid deduction.

As the statutory framework excerpted above illustrates, a personal holding company tax or surtax was imposed on undistributed personal holding company income for each taxable year. In computing this amount, a deduction was allowed, among other things, for *dividends paid during the taxable year* under section 561(a)(1). The deductions for consent dividends, section 561(a)(2), and carryover dividends, section 561(a)(3), are obviously not applicable to the instant case. See secs. 564 and 565.

The governing section on the facts of the present case is, therefore, section 561(a)(1). Petitioner is relying upon an interpretation of section 562 to support his spread-back contention. But section 562 has the function only of providing certain rules applicable to the computation of the *dividends-paid deduction* of section 561. Section 561(b), *supra*, provided that in determining the *dividends-paid deduction*, the rules given in section 562 would be applicable. Section 562 thus went on to define dividends eligible for the *dividends-paid deduction*. These included dividends within the meaning of section 316 (not in issue here), and distributions in liquidation. In the instant case, we do indeed have a distribution in liquidation under section 562(b), the purpose of which provision is to define a deduction already limited to *dividends paid during the taxable year* by section 561(a)(1). As mentioned, paragraphs (2) and (3) of section 561(a) which deal with consent and carryover dividends are not arguably applicable on the facts of this case.

Petitioner's basic contention is that is that section 562(b) contains no limitation as to the year in which a distribution in liquidation is to be deducted, and as petitioner further states on brief, "Economic reality dictates that in almost all cases, the accumulated earnings and profits of a corporation would exceed the amount of undistributed personal holding company income which the corporation had earned in the year of liquidation."

The provision in question simply provides as follows:

In the case of amounts distributed in liquidation, the part of such distribution which is properly chargeable to earnings and profits accumulated after February 28, 1913, shall be treated as a dividend for purposes of computing the dividends paid deduction. * * * [Sec. 562(b), *supra*.]

From this language, petitioner concludes through his reasoning already alluded to that "Congress could not have intended to give a taxpayer a large deduction for dividends paid and at the same time limit the amount of the deduction which could be effectively utilized."

We have already indicated our conclusion that section 562(b) does not in and of itself provide a deduction. It merely defines the dividends which qualify for the dividends-paid deduction of section 561, and under the explicit language of section 561(a)(1), the deduction of the type presently sought is limited to dividends paid during the taxable year. However, even if it is assumed *arguendo* that section 562(b) provides an independent deduction, there is nothing in its language which explicitly suggests the spreading or carrying back of a deduction over prior taxable years. Tax accounting within our revenue structure is on an annual basis. We are confident that before a tax-accounting procedure may transcend the taxable year in which a reflected transaction occurs, there must be clear and explicit congressional direction therefor. This proposition, we think, is beyond the realm of respectable argument, so thoroughly engrained is the principle of annual tax accounting in our statutory scheme. Furthermore, the very treatment advanced by petitioner has been rejected in a case involving section 27(g), I.R.C. 1939, the predecessor of section 562(b). See *Bride* v. *Commissioner*, 224 F. 2d 39, 43 (C.A. 8, 1955), affirming a Memorandum Opinion of this Court. The *Bride* case involved the application of the dividends-paid "credit" to the accumulated-earnings surtax imposed by section 102 of the 1939 Code.

Respondent's determinations must in all respects be sustained.

Reviewed by the Court.

*Decision will be entered for the respondent.*